## JACK & JILL, INC.
### vs.
## JOSEPH M. TONE
(Administrator of Unemployment Compensation)

Superior Court  New Haven County  File #55109

MEMORANDUM FILED DECEMBER 27, 1938.

Moses Merriam, of New Haven; Nathan R. Bassett, of New Haven; Mark Silverstein, of Boston, Mass., for the Plaintiff.

Harry Silverstone, Special Assistant Attorney General, for the Defendant.

CORNELL, J. This is an appeal from the action of the Commissioner of Labor and Factory Inspection, acting in the capacity of administrator of unemployment compensation under the provisions of chapter 280a of the Supplement to the General Statutes (1937), in determining that an additional amount of contribution is due from the plaintiff for the contribution period of the second, third and fourth quarters of 1937, in the sum of $252.53, plus interest in the amount of $21.12, or a total of $273.65. The essence of plaintiff's claimed aggrievement is that the administrator's determination is erroneous in that it is predicated upon the earnings of persons who were not, within the concept of the statute named, employees of the plaintiff.

Insofar as is material here, the statute (Supp. [1937] §803d, subsec. [a]) defines employment as the term is therein used, to be "any service. . . .performed under any express or implied contract of hire creating the relationship of master and servant . . . ." In making the ruling complained of, the administrator acted in an administrative capacity. The function of the Court in the instant proceeding is not to determine the issue according to its own view, if that differ from the administrator's, but only to ascertain whether the administrator's conclusion was unreasonable, arbitrary or illegal. *Grady vs. Katz,* 124 Conn. 525, 530; *Loglisci vs. Liquor Control Commission,* 123 id. 31, 36; *Huntington Telephone Co. vs. Public Utilities Comm.,* 118 id. 71, 80; *Brein vs. Conn. Eclectic Examining Board,* 103 id. 65, 87; *DeFlumeri vs. Sunderland,* 109 id. 583, 585; *Conn. Mutual Life Ins. Co. vs. Rogers,* 113 id. 14, 18.

The relationship under examination was initiated as the result of written agreements, all in the same form, substance and intendment, made between the plaintiff and the persons selling its ice cream merchandise upon whose earnings the additional contributions complained of are based. Without attempting to fully summarize the provisions of these, certain of their terms must be noticed.

The plaintiff is engaged in the sale of certain ice cream products and ice cream to the public. It owns a number of light trucks upon which is displayed the distinguishing designation "Jack & Jill." These vehicles are equipped with refrigerating facilities. Its method of distribution is to load

these with its merchandise and place them in charge of young men who drive them to certain sections of a town and there station them at advantageous places, or circulate about, attracting attention to them thereby.

The written agreements which the drivers of these cars are required to, and have signed, provide in substance (1) that the plaintiff shall loan to an operator (described as a 'Purchaser') one of the motor trucks; (2) sell to the purchaser on consignment all of the ice cream and ice cream products required by the latter in the ice cream business to be conducted by him under the agreement; (3) accept without charge to the purchaser at the end of each business day all goods so furnished and returned which are in good condition and sell to him all not so returned at certain stipulated prices; and (4) loan to the purchaser "one 'Route' " and "List of Customers" to be returned to the plaintiff at the termination of the relationship. The engagements made by such drivers in such agreements are, in effect, these: (1) that the purchaser shall sell plaintiff's ice cream and ice cream products exclusively and not have any other merchandise on the truck at any time; (2) that at the end of each business day he will pay the plaintiff "in full and in cash", on the stipulated basis, "for the merchandise purchased from Jack & Jill" with the right to return without charge all unsold goods delivered to him on taking the load out, if undamaged; (3) to supply all motor oil and gasoline required for the operation of the truck at his own expense; (4) to be liable for all repairs to the truck supplied him and for all injuries to persons or damage to property caused by it while in his possession or control, the plaintiff, however, being "irrevocably authorized" by him to settle any such claim, in which event the purchaser agrees to reimburse plaintiff therefor; (5) to deliver up the truck to plaintiff at any time or place that the plaintiff may demand; (6) at the termination of the relationship to return to the plaintiff the "list of customers" furnished; (7) and thereafter to refrain for a period of two years from engaging "directly or indirectly, either for himself or in a partnership with others, or in a corporation, or become employed by any person, partnership, firm or corporation in the retail ice cream business on the whole or any part of said route or in any part of the country in which said route lies, nor solicit any of the customers on said 'List of Customers' "; (9) to furnish the plaintiff with a cash bond in a stipulated sum as security for the faithful performance of the agree-

ment; (9) other agreements of no particular materiality here.

In the performance of the agreements summarized, *supra*, certain incidents occurred. Among these, the plaintiff maintained a supply of freshly laundered white trousers, coats and hats. While, occasionally, on hot days, the coat or hat was removed after the trucks had reached the "route", it seems evident that the plaintiff insisted that those be usually worn when plaintiff's merchandise was being offered for sale. Plaintiff furnished those without charge to the drivers. Other details of evidence need not be referred to except, possibly, as incidental to the observations hereinafter made.

Plaintiff claims that the relationship defined by drivers executing the agreement described is that of an independent contractor. The "accepted general definition" of an independent contractor is adopted by both parties and their arguments are built thereupon, viz., one who exercises an independent employment and contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work. *Cumbo vs. McGurk, Inc.*, 124 Conn. 433, 435; *Caraher vs. Sears, Roebuck & Co.*, 124 id. 409, 413; *Francis vs. Franklin Cafeteria, Inc.*, 123 id. 320, 323; *Welz vs. Manzillo*, 113 id. 674, 679; *Lassen vs. Stamford Transit Co.*, 102 id. 76, 79; *Kinsman vs. Hartford Courant Co.*, 94 id. 156, 159; *Alexander vs. Sherman's Sons Co.*, 86 id. 292, 297. The difficulty is in the practical application of this general statement. The controlling consideration is, however, held to be whether the employer has *general* authority to direct what shall be done—the *right* of general control of the work. *Welz vs. Manzillo, supra*, p. 680; *Morganelli vs. Derby*, 105 Conn. 545, 551; *Lassen vs. Stamford Transit Co., supra*, 79; *Aisenberg vs. Adams Co., Inc.*, 95 id. 419, 421; *Thompson vs. Twiss*, 90 id. 444, 447. Certain salient considerations only, need be noticed in the instant case.

The contract here did not provide that a driver devote any specified number of hours to the sale of merchandise nor any particular number of days per week. In practice, a driver was not required to take out a load on a rainy day and often failed to do so. While there was no formal rule enunciated, drivers, nevertheless, reported to plaintiff's place of business during the warm season about a certain hour in the forenoon and were expected not to return earlier than about 11:00 o'clock p.m., when the weather was fair. Certain representatives of the

plaintiff, however, exercised a certain inspection, if not super-vision, over the trucks during the selling hours, at least to the extent of motoring about the various routes to learn if the trucks were stationed there. While all this, together with other details, did not, in itself, evince an actually exerted con-trol, it can hardly be said that if the administrator concluded that it was some evidence, indicative of a *right* to exercise con-trol, when considered in the light of the agreement, such a conclusion would not be unreasonable. Again, the agreement could be terminated at any instant by either party without any notice to the other. In this circumstance there was present, or at least, could be found to be present, a potential power of control, in that a driver would be at all times aware that if he did not obey any order which the plaintiff might issue, whether relating to the place where, or the days or hours during which he would be required to sell its products, he might be at once discharged. The retention of this right in the plaintiff, exist-ent not because of any express provision of the agreement, but by reason of the silence of the contract, comes close to, if it is not decisive of the presence in the plaintiff of the "right of general control of the work." The decisive factor is the ex-istence of the *right* of general control; it is immaterial whether it is actually exercised. *Caraher vs. Sears, Roebuck & Co.,* 124 Conn. 409, 414; *Cumbo vs. McGurk, Inc.,* 124 id. 433, 436.

To it may be added another, viz., the provision of the re-strictive covenant in the agreement. This is explicable only on the theory that the goodwill developed by the sale of plaintiff's products is plaintiff's. But if the drivers are independent con-tractors, the business is their own and the goodwill, too, as an inseparable part of it, if not, indeed, its entirety. It must be assumed that the plaintiff intended that the restrictive agree-ment protect something which it had a right to protect. That could only be the goodwill arising from the sale of and public demand for its own particular merchandise. This, obviously, presupposes that it owned the goodwill thereby produced. If it owned the goodwill, then it owned the business, which is but to say that the business was not that of the driver and so the latter was not an independent contractor in fostering and nur-turing it. Other phases of the subject need not be discussed. It is evident that no one factor is decisive of the question, as may be seen by an examination of the pronouncements in the following cases in this jurisdiction, viz., *Caraher vs. Sears, Roe-buck & Co.,* 124 Conn. 409, 413, 414; *Francis vs. Franklin*

*Cafeteria, Inc.,* 123 id. 320, 325, 326; *Welz vs. Manzillo,* 113 id. 674, 681; *Tortorici vs. Mossup, Inc.,* 107 id. 143; *Norwalk Gaslight Co. vs. Borough of Norwalk,* 63 id. 495, 525. If the *right* of general control exists in the employer, whether it be, or however it be exercised, the relationship is that of master and servant, as the authorities cited *supra,* demonstrate. See cases cited *supra.*

In the instant case, the administrator, notwithstanding the forms of the agreement and the use of certain terms connotative of different relationships, might not unreasonably have concluded, in the light of the circumstances surrounding the parties when they executed the agreement and their conduct in and incident to the performance of it, that it contemplated nothing more than a contract of employment under which the services to be rendered should be compensated in the equivalent of what might otherwise have been denominated commissions, and hence, that the relationship of master and servant within the meaning of the statute arose and subsisted at the time liability for the contributions in question occurred.

As the question discussed is the only one raised or urged, it is concluded that the administrator's order is not unreasonable, arbitrary or illegal and must, hence, stand.

Judgment accordingly.